WORK *vs.* ELLIS and others.

</div>

It would be very unsafe to determine the invalidity of an assignment in trust for the benefit of creditors, on the unsupported evidence of the assignor. Such evidence should only prevail when it is corroborated by the testimony of others, or by the facts and circumstances preceding and accompanying the execution of the instrument.

But where the assignor positively swore that he executed the assignment, not for the purpose of having the assigned property distributed among his creditors according to the tenor and directions of the instrument, but with the hope, and for the purpose of effecting a compromise with them, and he was corroborated in his testimony by the assignees; it was *held* that the instrument was totally void.

If the assignors, in an instrument of that description, are actuated by such an intent, it is void; whatever may have been the intent of the other parties to it.

Whether a provision in an assignment, requiring or directing the assignees to sell the property at public auction makes it null and void, or not, it is a strange provision, and tends to confirm the idea, authorized by other evidence, that the chief object of the whole transaction was to coerce or persuade the creditors into a settlement. *Per* CLERKE, J.

THIS was an action to set aside an assignment of property in trust for the benefit of creditors.

CLERKE, J. It would, undoubtedly, be very unsafe to determine the invalidity of an assignment in trust for the benefit of creditors, on the unsupported evidence of the

assignor. Such evidence should only prevail when it is corroborated by the testimony of others, or by the facts and circumstances preceding and accompanying the execution of the instrument.

Robert Ellis, the managing partner of the concern, positively swears that he executed this assignment, not for the purpose of having the assigned property distributed among his creditors according to the tenor and directions of the instrument, but with the hope, and for the purpose, of effecting a compromise with them. This, according to his testimony, was the primary and principal object which induced him to make this assignment; and, of course, if this was the intent, under which he acted, the instrument is totally void. For, it is certain that if the assignors in an instrument of this description are actuated by such an intent, it is void'; whatever may have been the intent of the other parties to it. Mr. Ellis says that he first spoke to some of his creditors after he found his house was embarrassed, and "told them that he thought he could get a settlement by paying fifty cents on the dollar defore the stock was sacrificed or any more losses had." This, if he is to be believed, was throughout uppermost in his mind, down to the moment when he executed the instrument. The following question was put to him by the court : "What effect did you suppose the making of the assignment would have in procuring a settlement?" He answered: "I supposed it would stop the sale of the property by these judgments and executions; and I supposed, if I called a meeting of the creditors, I could make them believe it was for their interest to accept a settlement, rather than to sacrifice the goods." Is he corroborated in testifying to this intent, by Mr. Bradley, or Mr. Hawks, the assignees? They contradict him, no doubt, in many portions of his testimony; and if the allegation that Ellis entertained and allowed this plan of inducing creditors to make a settlement was not confirmed by the testimony of

Bradley or Hawks, I would altogether reject the testimony of Ellis as to the intent. We must bear in mind that we are endeavoring to ascertain, not the intent of Hawks, or of Bradley, but the intent of Ellis. Hawks swears that he never intended to hinder, delay or defraud the creditors ; but that he would do any thing that was not unlawful, to carry out the views of Ellis, and that he would be guided entirely, in this respect, by his legal adviser. But what were those views ? Hawks very clearly shows what they were ; and that they were what Ellis declares they were. He says that at the meeting in John street, which he and some other creditors attended, after Ellis stated the amount of his assets and his debts, he added that he (Ellis) thought at that time that he had friends who would help him ; and he could get out of it if a settlement could be made. After Hawks consented to accept the trust, he went with Ellis to his lawyer's office, and had some conversation with him there, in which he (Hawks) said that " I believed persons could manage their affairs better than it could be done by the assignees or any other party ; that a great many of their debtors were in the south, and that they (the assignors) could collect more money out of them than any body else ; that if he (Ellis) could get his friends to help to pay up or close this estate between him and his creditors it would be better for him to do so." And again : "I told Mr. Ellis, if I told him anything, that I would aid him in the best way I could to lift the assignment ; this conversation was a running one, had while the papers were being drawn." "I told Mr. Ellis I would aid him to obtain a settlement." In recommending Bradley as one of the assignees he mentioned to Ellis, as the principal reason, that Bradley would aid him materially in procuring a settlement, as he had influence with the American creditors, and "if the American merchants settled with him, the others would naturally drop into it." And, in confirmation of this expectation, on the part of both Ellis and Hawks,

the latter says that, after the execution of the assignment, Ellis brought his friend, who, he had told them previously, would lift the assignment; but as it was real estate he offered, the offer was rejected. Hawks expressly says, in the cross-examination, that Ellis did speak about his expectation or hope to lift the assignment by a settlement. At the time the counsel was drawing it, "Ellis said he had friends who would furnish him money, and I told him that the creditors would sooner make a settlement and lift it than they would let it go through an assignment." "I had hopes Mr. Ellis would bring friends forward to do it." This idea of settlement pervaded his mind throughout the whole transaction; and shall we say that it did not pervade the mind of Ellis also. The latter positively swears, in effect, that it did; and that his intent in making the assignment was to accomplish this settlement. Hawks, throughout, corroborates this assertion. As we have seen, he swears that Ellis spoke about his expectation or hope to lift the assignment. To be sure, he contradicts Ellis in some particulars, and denies that he promised to guaranty a settlement; but he confirms him in the only point essential to the inquiry before us; and that inquiry is, not whether Hawks made promises, but whether Ellis made this assigment with the view of effecting a compromise with his creditors; instead of securing a *bona fide* distribution of his assets among them, as prescribed by the language of the instrument. I think there can be no reasonable doubt that this was his intention. Having arrived at this conclusion, it is not necessary for me pass upon the legal question whether the restriction in the assignment, requiring or directing the assignees to sell the property at public auction, makes it null and void; but I must say that it is a strange provision, and tends to confirm the idea, in my mind, that the chief object of the whole transaction was to coerce or persuade the creditors into a settlement. Many

of them would naturally say that it would be better to compromise, even at fifty per cent, than to have the property sacrificed at auction.

Judgment for the plaintiff, in conformity with the prayer of the complaint, with costs.

[NEW YORK SPECIAL TERM, December 2, 1867. *Clerke*, Justice.]